UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
FRANKFORT

CIVIL ACTION NO. 06-CV-24-KKC

BART McQUEARY,                                                    PLAINTIFF,

v.                                **OPINION AND ORDER**

GREGORY D. STUMBO,
*in his Official Capacity as Attorney General*
*of the Commonwealth of Kentucky,*                               DEFENDANT.

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

This matter is before the Court on the Motion for Preliminary Injunction (Rec. No. 2) of the Plaintiff, Bart McQueary; the Motion for Judgment on the Pleadings (Rec. No. 8) of the Defendant, Gregory D. Stumbo, in his official capacity as Attorney General of the Commonwealth of Kentucky (the "Attorney General"); and McQueary's Motion to Consolidate the hearing on the Motion for Preliminary Injunction with the trial on the merits of this matter (Rec. No. 17).

I.      **BACKGROUND.**

With his Complaint, McQueary asserts that Sections 5(1)(b) and (c) of House Bill 333 (HB 333) and Senate Bill 93 (SB 93)(together, the "Act"), which Kentucky Governor Ernie Fletcher signed into law on March 27, 2006, infringe upon his right to protest at funerals under the First and Fourteenth Amendments to the Constitution and are facially unconstitutional.  (Rec. No. 1, Complaint ¶¶ 1-2, 18).  HB 333 and SB 93 are identical in all relevant respects.

A.      **The Act.**

The Act begins with the following explanation of its purpose:

WHEREAS, certain despicable individuals have been disrupting the funerals of soldiers who died while serving in the United States Armed Forces; and

WHEREAS, these disruptions have taken such forms as shouting insults at the parents of the fallen; and

WHEREAS, the military dead and their families deserve respect and compassion; and

WHEREAS, all mourners should be left in peace;

2006 Kentucky Laws Ch. 50 (S.B. 93)(effective March 27, 2006).

The Act's relevant provisions are set forth below.

**1)       Section 1 – Disorderly Conduct.**

Section 1 of the Act provides that a person is guilty of disorderly conduct in the first degree

when he or she:

(a) In a public place and with intent to cause public inconvenience, annoyance, or alarm, or wantonly creating a risk thereof:

1. engages in fighting or in violent, tumultuous, or threatening behavior;
2. makes unreasonable noise; or
3. creates a hazardous or physically offensive condition by any act that serves no legitimate purpose; and

(b) Acts in a way described in paragraph (a) of this subsection within three hundred (300) feet of a:

1. Cemetery during a funeral or burial;
2. Funeral home during the viewing of a deceased person;
3. Funeral procession; or
4. Funeral or memorial service;[1] and

c) Knows that he or she is within three hundred (300) feet of an occasion described in paragraph (b) of this subsection.

---

[1] Section 1(1)(b)(4) of HB 333 reads "Building in which a funeral home or memorial service is being conducted."  The Attorney General asserts that, when the Acts are codified in the Kentucky Revised Statutes, Section 1(1)(b) will list five places protected by the 300-foot zone and will include a "Building in which a funeral home or memorial service is being conducted" as provided in the House version. (Rec. No. 9, Response at 8 n.15). Whether this alteration occurs has no bearing on this Opinion.

*Id*.

**2)      Section 3 – Disrupting a Funeral.**

Section 3 of the Act provides that a person is guilty of disrupting meetings and processions

in the first degree when:

> with intent to prevent or disrupt a funeral or burial, funeral home viewing of a
> deceased person, funeral procession, or funeral or memorial service for a deceased
> person, he or she does any act tending to obstruct or interfere with it physically or
> makes any utterance, gesture, or display designed to outrage the sensibilities of the
> group attending the occasion.

*Id*.

**3)      Section 5 – Interfering with a Funeral.**

Section 5 of the Act provides the following:

(1)      A person is guilty of interference with a funeral when he or she at any time
on any day:

(a)      Blocks, impedes, inhibits, or in any other manner obstructs or interferes with
access into or from any building or parking lot of a building in which a
funeral, wake, memorial service, or burial is being conducted, or any burial
plot or the parking lot of the cemetery in which a funeral, wake, memorial
services, or burial is being conducted;

(b)      Congregates, pickets, patrols, demonstrates, or enters on that portion
of a public right-of-way or private property that is within three
hundred (300) feet of an event specified in paragraph (a) of this
subsection; or

(c)      Without authorization from the family of the deceased or person
conducting the service, during a funeral, wake, memorial service, or
burial:

1.      Sings, chants, whistles, shouts, yells, or uses a
bullhorn, auto horn, sound amplification equipment or
other sounds or images observable to or within
earshot of participants in the funeral, wake, memorial
service, or burial; or

3

2.      Distributes literature or any other item.

(2)      Interference with a funeral is a Class B misdemeanor.

*Id.*

McQueary challenges only Section 5(1)(b) and (c) of the Act.  He does not challenge any other provision of the Act.  Specifically, he asserts that Sections 5(1)(b) and (c) are unconstitutional prior restraints on speech and are not narrowly tailored to serve a significant government interest and do not leave open alternative channels for communication. (Rec. No. 1, Complaint ¶ 17).  He further asserts that Sections 5(1)(b) and (c) and are overbroad.  (Rec. No. 1, Complaint ¶¶ 19-20, 24).  Finally, he asserts that Section 5(1)(c) unconstitutionally makes speech on public property contingent upon the approval of a private party.  (Rec. No. 1, Complaint ¶ 22).

### B.      McQueary's Proposed Communications.

McQueary asserts that he has picketed funerals with the Westboro Baptist Church three times in Kentucky. (Rec. No. 1, Complaint ¶ 10, 21).  He states that such protests are an effective way to convey the church's message. (Rec. No. 1, Complaint ¶ 11).  He states he wants to protest at future funerals but fears he will be prosecuted for violating Sections 5 (1)(b) and (c) of the Act. (Rec. No. 1, Complaint ¶ 12).

McQueary states that he wishes to congregate, picket, or demonstrate on that portion of a public right-of-way that is within 300 feet of a funeral, wake, memorial service or burial[2] in a manner that does not, and is not intended to disrupt the event.  (Rec. No. 1, Complaint ¶ 13).

McQueary further wishes to make sounds and display images observable to or within earshot

---

[2] Throughout this Opinion, the Court will refer to all of the events covered by Sections 5(1)(b) and (c) – funerals, wakes, memorial services and burials – simply as "funerals."

4

of funeral participants, in a manner that does not, and is not intended to, disrupt the funeral. McQueary wishes to make these sounds and display these images without seeking or obtaining authorization from the family of the deceased or person conducting the funeral. (Rec. No. 1, Complaint ¶ 14). McQueary states that he also wishes to distribute literature in a non-disruptive manner without first obtaining the permission of the family of the deceased or person conducting the funeral.  (Rec. No. 1, Complaint ¶ 15).

McQueary moves for a preliminary injunction (Rec. No. 2) enjoining the Attorney General from enforcing Sections 5(1)(b) and (c).  The Attorney General filed a Counterclaim (Rec. No. 6), asking the Court to declare that the provisions are valid and moves, pursuant to Federal Rule of Civil Procedure 12(c), for judgment on the pleadings on his Counterclaim. (Rec. No. 8).

## II.   STANDARDS OF REVIEW.

When deciding whether to issue a preliminary injunction, a district court should balance: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury if the injunction is not issued; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction. *Tumblebus, Inc. v. Cranmer*, 399 F.3d 754, 760 (6th Cir.), *cert. denied*, 126 S.Ct. 361 (2005).  In First Amendment cases, the first factor will often be determinative.  *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).  In this case, as in most First Amendment cases, the decision of whether to grant the requested injunction turns on McQueary's likelihood of success on the merits.  *Id.*

Federal Rule 12 (c) provides that, "[a]fter the pleadings are closed but within such time as not to delay the trial, any party may move for judgment on the pleadings." Fed.R.Civ.P. 12(c). Like

5

a Rule 12(b)(6) motion, a Rule 12(c) motion tests the legal sufficiency of the plaintiff's complaint. *See Scheid v. Fanny Farmer Candy Shops Inc.,* 859 F.2d 434, 436 n. 1 (6th Cir.1988). When deciding the motion, "[t]he court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the plaintiff undoubtedly can prove no set of facts in support of his claims that would entitle him to relief." *Cline v. Rogers,* 87 F.3d 176, 179 (6th Cir.1996).

### III.   ANALYSIS.

Neither party has requested a hearing on this matter.  Both parties agree that, as a facial challenge to the provisions at issue, this matter involves only issues of law and no issues of fact.  In McQueary's Motion to Consolidate the hearing on the Motion for Preliminary Injunction with the trial on the merits (Rec. No. 17), McQueary states that the absence of any factual disputes in this matter makes a hearing unnecessary.  After reviewing the record, the Court finds that an evidentiary hearing will serve no purpose and that this matter may be decided based on the pleadings.  Thus, McQueary's Motion to Consolidate the hearing on his motion with the trial on the merits will be denied as moot, the Court having decided that no hearing on this motion is necessary.

### A.   Likelihood of Success on the Merits.

### 1)   The Overbreadth Doctrine.

In determining McQueary's likelihood of success on the merits, the Court will first address McQueary's facial challenge to Sections 5(1)(b) and (c) on the basis that the provisions are overbroad.  The "overbreadth doctrine provides an exception to the traditional rules of standing and allows parties not yet affected by a statute to bring actions under the First Amendment based on a belief that a certain statute is so broad as to 'chill' the exercise of free speech and expression."

6

*Dambrot v. Central Michigan University,* 55 F.3d 1177, 1182 (6ᵗʰ Cir. 1995).

Generally, a facial challenge to a statute must be rejected unless there is *no set of circumstances* in which the statute can be constitutionally applied.  *United States v. Salerno,* 481 U.S. 739, 745 (1987).  There is an exception to this rule, however, for facial challenges based upon First Amendment free speech grounds, pursuant to which "[w]e have applied to statutes restricting speech a so-called 'overbreadth' doctrine, rendering such a statute invalid in all its applications (*i.e.,* facially invalid) if it is invalid in any of them." *Ada v. Guam Society of Obstetricians & Gynocologists,* 506 U.S. 1011, 1012 (1992)(Scalia, J., dissenting from denial of certiori); *National Endowment for the Arts v. Finley,* 524 U.S. 569, 618 (1998) (Souter, J. dissenting). *Cf. Salerno,* 481 U.S. at 745 ("The fact that the Bail Reform Act might operate unconstitutionally under some conceivable set of circumstances is insufficient to render it wholly invalid, since we have not recognized an 'overbreadth' doctrine outside the limited context of the First Amendment.").

Although actions which challenge the constitutionality of a law on its face before any enforcement proceedings have been initiated against the plaintiff are "sometimes permissible and often have been entertained, especially when speech protected by the First Amendment is at stake, to prevail on a facial attack the plaintiff must demonstrate that the challenged law either 'could never be applied in a valid manner' or that even though it may be validly applied to the plaintiff and others, it nevertheless is so broad that it 'may inhibit the constitutionally protected speech of third parties.'" *New York State Club Ass'n, Inc. v. City of New* York, 487 U.S. 1, 11 (1988)(quoting *City Council of Los Angeles v. Taxpayers for Vincent,* 466 U.S. 789, 798 (1984)).

> Properly understood, the latter kind of facial challenge is an exception to ordinary standing requirements, and is justified only by the recognition that free expression may be inhibited almost as easily by the potential or threatened use of power as by

7

the actual exercise of that power. *Thornhill v. Alabama,* 310 U.S. 88, 97-98 (1940). Both exceptions, however, are narrow ones: the first kind of facial challenge will not succeed unless the court finds that "every application of the statute created an impermissible risk of suppression of ideas," *Taxpayers for Vincent, supra,* 466 U.S., at 798, n. 15, and the second kind of facial challenge will not succeed unless the statute is "substantially" overbroad, which requires the court to find "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." 466 U.S. at 801.

*Id. See also Spingola v. Village of Granville*, 39 Fed. Appx. 978, 981 (6ᵗʰ Cir. 2002)(unpublished opinion).

 "In a facial challenge to the overbreadth and vagueness of a law, a court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.* , 455 U.S. 489, 494 (1982). "[W]here a statute regulates expressive conduct, the scope of the statute does not render it unconstitutional unless its overbreadth is not only real, but *substantial* as well, judged in relation to the statute's plainly legitimate sweep." *Osborne v. Ohio*, 495 U.S. 103, 112 (1990)(quotations and citation omitted).  "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Taxpayers for Vincent*, 466 U.S. at 800.

If the statute is overbroad, the question then becomes whether to apply the overbreadth doctrine to strike it down.  The Supreme Court has recognized that the overbreadth doctrine is "strong medicine" and has, therefore, "been employed by the Court sparingly and only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973).  "Facial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute."  *Id*. "In evaluating a facial challenge to a state law, a federal court must, of course, consider any limiting

construction." *Hoffman Estates*, 455 U.S. at 494 n.4. Pursuant to a "well-established principle," this Court must interpret the statute to "avoid constitutional difficulties." *Frisby v. Schultz*, 487 U.S. 474, 483 (1988). Nevertheless, "federal courts are without power to adopt a narrowing construction of a state statute unless such construction is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988); *Stenberg v. Carhart*, 530 U.S. 914, 944-45 (2000).

      **2)**      **The Appropriate Constitutional Standard.**

      The First Amendment provides that "Congress shall make no law. . . abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. Const., amend. I.

      In determining whether Section 5(1)(b) or (c) is unconstitutionally overbroad, the first issue is whether the challenged provisions are "content based" or "content neutral." Resolution of this issue determines the level of judicial scrutiny to apply to the provisions. A content-neutral regulation is subject to an intermediate level of scrutiny pursuant to which the law survives if it is "narrowly tailored to serve a significant government interest, and leave[s] open ample alternative channels of communication." *Frisby*, 487 U.S. at 481. In contrast, a content-based regulation is subject to the highest degree of constitutional scrutiny pursuant to which the regulation must be necessary and narrowly tailored to achieve a compelling public interest. *Grider v. Abramson*, 180 F.3d 739,748 (6th Cir. 1999); *See also Frisby*, 487 U.S. at 481.

      "Our principal inquiry in determining content neutrality is whether the government has adopted a regulation of speech 'without reference to the content of the regulated speech.'" *Madsen v. Women's Health Center, Inc.*, 512 U.S. 753, 763 (1994)(quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). "We thus look to the government's purpose as the threshold

consideration." *Id*. The principal inquiry in determining content neutrality "is whether the government has adopted a regulation because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. "The government's purpose is the controlling consideration." *Id*. A "regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages, but not others." *Id*.

In *Renton v. Playtime Theatres, Inc.*, 475 U.S. 41 (1986), the Supreme Court determined that, if the government's "predominate intent" in regulating speech is content neutral, then the statute will be deemed content neutral, even where the statute is content based on its face and suppression of content was "a motivating factor" behind the statute. In *Renton*, the Court upheld a city ordinance regulating the location of adult theaters. The ordinance had a clause explaining that such businesses would have a severe impact upon the surrounding neighborhoods. *Id*. at 44. The Court noted that the ordinance clearly treated adult film theaters differently from other kinds of theaters but determined that the ordinance was "aimed not at the *content* of the films shown at 'adult motion picture theaters,' but rather at the *secondary effects* of such theaters on the surrounding community." *Id*. at 47.

In determining that, despite its plain language, the statute was content neutral, the Supreme Court relied on the district court's finding that the City Council's "'*predominate* concerns' were with the secondary effects of adult theaters, and not with the content of adult films themselves." *Id*. The Supreme Court rejected the Ninth Circuit's holding that, "if '*a motivating factor*' in enacting the ordinance was to restrict respondent's exercise of First Amendment rights the ordinance would be invalid." *Id*. "The District Court's finding as to 'predominate' intent, left undisturbed by the Court of Appeals is more than adequate to establish that the city's pursuit of zoning interests here was

10

unrelated to the suppression of free expression." *Id*. at 48. *See also Colacurcio v. Kent*, 163 F.3d 545, 551 (9th Cir. 1998)("[a] finding that the restriction of First Amendment speech is a 'motivating factor' in enacting an ordinance is not of itself sufficient to hold the regulation presumptively invalid"); *Walnut Properties, Inc. v. Whittier*, 808 F.2d 1331, 1335 (9th Cir. 1987)(discussing "*Renton's* distinction between an improper motivating factor and an unconstitutional predominant purpose in enacting" an ordinance); *Buzzetti v. New York*, 140 F.3d 134, 139 (2nd Cir. 1998)(same).

In *Cleveland Area Board of Realtors v. City of Euclid*, 88 F.3d 382 (6th Cir. 1996), the Sixth Circuit indicated that the Court should consider the government's "stated principal justification" for a statute in determining whether the statute is content based or content neutral. *Id*. at 385. In that case, the Court reviewed a city ordinance regulating the size, number and placement of signs in residential neighborhoods. *Id*. at 383. The district court determined that the ordinance was content based because, although the city's "stated principal justification" for the ordinance was to improve the City's appearance, the facts showed that the city's actual motivation was to curtail the negative messages associated with the proliferation of real estate signs in neighborhoods. *Id*. at 385. In making this finding, the district court relied on a plan submitted to the Mayor from another city official; the comments of a councilman who had sponsored the ordinance and the comments of another city official; a letter from the city's legal counsel to a city official; and the ordinance's preamble. *Id*.

The Sixth Circuit determined that the district court's finding that the statute was content-based was clear error because "[a]lthough the record establishes that one of the City's motivations for the ordinances was to stem 'panic selling'. . .the City's stated aesthetics rationale. . . is voiced in the record and appears in the legislation itself, including the preamble to the original ordinance."

*Id.* at 387.  Noting the "limited inquiry that case law permits when reviewing legislative motive," the Court determined that, "because Euclid's 'time, place, and manner' restriction on signs is justified on the basis of aesthetics without reference to the content of the signs, it must be considered content-neutral. . . ." *Id.* 387-88.

In *Hill v. Colorado*, 530 U.S. 703 (2000),  the Supreme Court reviewed a Colorado statute that prohibited any person within 100 feet of a health care facility's entrance from "knowingly approach[ing] within eight feet of another person, without that person's consent, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person. . . ." 503 U.S. at 707 (quotations omitted).  In dissent, Justice Kennedy stated that "the purpose and design of the statute – as everyone ought to know and as its own defenders urge in attempted justification – are to restrict speakers on one side of the debate: those who protest abortions." *Id.* at 768.  "One need read no further than the statute's preamble to remove any doubt about the question.. . .The legislature's purpose to restrict unpopular speech should be beyond dispute." *Id.* at 768-69.

Nevertheless, the majority stated that "the contention that a statute is 'viewpoint based' simply because its enactment was motivated by the conduct of the partisans on one side of the debate is without support." *Id.* at 724.  The Court determined that "the relevant First Amendment point is that the statute would prevent both [pro-choice and pro-life] speakers, unless welcome, from entering the 8-foot zone.  The statute is not limited to those who oppose abortion." *Id.* at 725.

The Court explicitly reiterated that the principal inquiry was whether the government adopted the regulation of speech *because of* disagreement with its message. *Id.*  at 719. In determining that the statute was content neutral, the Supreme Court cited the state courts' interpretation of the

12

legislative history but found more important the state Supreme Court's unequivocal holding that the statute's restrictions apply equally to all demonstrators, regardless of viewpoint and the fact that the statutory language "makes no reference to the content of the speech." *Id*. at 719.   In addition, the Court determined that the "State's interests in protecting access and privacy were unrelated to the content of the demonstrators' speech. *Id*. at 719-20.

Accordingly, in determining whether a statute is content based, the Court's principal inquiry is the government's predominate purpose. This may be determined by the government's justifications for the statute as stated in the record and as revealed in the text of the statute whether in the preamble or substantive provisions.

There is no dispute here that the Act is at least partially aimed at prohibiting members of the Westboro Baptist Church ("WBC") from protesting at funerals, including those of soldiers killed in Iraq. In explaining the legislative history of the challenged law, the Attorney General states:

> It is public knowledge that since 1991, members of the Westboro Baptist Church of Topeka, Kansas ("WBC") have engaged in a campaign against homosexuality through demonstrating, picketing, and distributing fliers at public and private events. WBC members regularly picket outside public buildings and churches, in parks frequented by homosexuals, and at funerals of people who have died of AIDS. The messages conveyed by the plaintiffs' picketing signs and fliers include: "God Hates Fags"; "No Fags in Heaven"; "Fags are Worthy of Death, Rom. 1:32"; "Turn or Burn". . . The church members' message and activities have been received with great controversy and have been the subject of much public discourse and media attention. . . . [WBC members] have received national notoriety for protesting at military funerals, where they hold signs saying "Thank God for Dead Soldiers," "Thank God for IEDs," and "God Hates Cripple (sic) Soldiers," all the while yelling at the bereaved family of the fallen soldier that their son or daughter is "rotting in hell" and that "God hates heir tears." WBC and its notorious preacher, Fred Phelps, unapologetically preach hatred and embrace the condemnation of all those they offend. . . .
> . . . Outraged at the cruel insensitivity and verbal assaults from these funeral protests, and desiring to protect the privacy of families grieving the death of a loved one, 31 states have enacted or are considering laws restricting when and where picketers may

demonstrate at funerals. Fifteen states have already enacted bills. . .Similar legislation
has also been introduced in Congress. . . .
. . . Although all the laws vary, they were no doubt enacted because of the funeral
picketing by Rev. Phelps' hate group.

(Rec. No. 9, Response at 1-4)(footnotes omitted).

Thus, it is clear that the Sections 5(1)(b) and (c) of the Act were motivated by a specific

desire to restrict the WBC's ability to demonstrate at soldiers' funerals.  To the extent that the

provisions were predominately motivated by the desire to restrict a particular speaker or message,

they are content-based regulations.

The Attorney General states the statute also serves the state's need to "avoid potentially

violent confrontations between funeral protesters and other persons, including members of the

grieving family." (Rec. No. 9, Response at 24).  The Supreme Court has made clear, however, that,

where "[t]he overriding justification for the regulation is concern for the effect of the subject matter

on [listeners]...[t]his is the essence of content-based regulation." *United States v. Playboy*

*Entertainment Group*, 529 U.S. 803, 811 (2000). "Listeners' reaction to speech is not a content-

neutral basis for regulation." *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 134 (1992).

*See also Boos v. Barry*, 485 U.S. 312, 321 (1988).

In *Grider v. Abramson*, 180 F.3d 739 (6th Cir. 1999), the Sixth Circuit reviewed an

emergency crowd control plan for a Ku Klux Klan rally to be held on the courthouse steps and a

contemporaneous counter-demonstration. *Id*. at 742.  The plan included a requirement that any

person who wanted to attend either rally, had to submit to a magnetometer (metal detector) search.

*Id*. at 744.  No person would be denied access to either rally for any reason except possession of

dangerous devices. *Id*. at 745.  The plaintiffs argued that the mandatory search violated their First

Amendment rights. *Id*. at 748.

The Court determined that, at a "superficial glance," the magnetometer searches appeared content neutral, noting that "every person entering the restricted area was searched in the same manner for the same facially content-neutral reason (the detection of dangerous implements)." *Id*. at 749.   However, citing to *Forsyth County*, the Sixth Circuit stated that, the "Supreme Court has dictated that government regulation of speech or assembly activities by speakers, motivated by anticipated *listener reaction* to the *content* of the implicated communication, is *not* content-neutral." *Id*. at 749.  "Similarly, government regulation of the speech, assembly, or association activities of members of a public speaker's audience, when triggered by fears of hostile listener response to the content of the speech, is not content neutral."  *Id*.

Thus, to the extent the provisions at issue in this case were predominately motivated by the need to avoid potentially violent confrontations between funeral protesters and other persons caused by the content of the protesters' speech, the provisions are content based.

The Attorney General also argues that the provisions at issue are justified by the state's need to "protect the freedom of other Kentuckians to exercise their rights of freedom of assembly and freedom of religion."  (Rec. No. 9, Response at 26).   The government argues that when funeral participants attend a funeral, they are exercising their right to freedom of religion – presumably when religion is included in the service – and their right to freedom of assembly.  The government argues that, as part of its duty to protect these rights, the state has an interest in preventing interference with funerals. Finally, the Attorney General argues that the state has an interest in protecting its citizens from unwanted communications. (Rec. No. 9, Response at 26-30).

To the extent that the provisions at issue were predominately motivated by the need to

prevent all interferences with all funerals regardless of the content or creator of the interference, the provisions are content neutral.  Likewise, to the extent that the provisions are justified by the need to prevent citizens from being subjected to all unwanted communications, regardless of the content or communicator, the provisions are content neutral. *See Hill*, 530 U.S. at 723 (holding statute that restricts communications with unwilling listeners that does not distinguish based on content or speaker is content neutral).

Because the provisions at issue were motivated by both content-based and content-neutral factors, the appropriate constitutional standard of review turns on whether, in enacting the statute, the state was *predominately* motivated by content-based or content-neutral concerns. Looking to the text of the statute, the provisions at issue apply evenhandedly to all speakers, not simply the WBC and to all communications whether likely to incite violence or not.  Subsection (b) prohibits all congregating, picketing, patrolling, demonstrating or entering on property that is within 300 feet of a funeral service no matter the message of the individual engaged in the conduct.  Thus, citizens are prohibited from "demonstrating" within 300 feet of a funeral with a sign stating "Thank You for Your Service" just as members of the WBC are prohibited from "demonstrating" in the buffer zone with a sign stating "Thank God for Dead Soldiers."  Likewise, subsection (c) prohibits all unauthorized and perceptible sounds and images and all unauthorized distribution of literature during a funeral service no matter the content or the speaker.  Accordingly, on its face, the statute is content neutral.

Considering the statute's plain language and the government's stated justifications for the statute, the Court finds the state's predominate purposes in enacting it were content neutral.  The provisions are not aimed at simply preventing disruptions caused by the WBC or preventing violent

reactions to the restricted speech. Accordingly, the provisions are content-neutral "time, place, and manner restrictions" and  intermediate scrutiny is the appropriate constitutional standard.  The provisions are valid if they are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.

### 3)      Whether Sections 5(1)(b) and (c) Serve a Significant State Interest.

The next issue is whether the state has a significant interest in preventing interference with funerals and protecting citizens from unwanted communications at funerals.  Analysis of this issue must begin with several important principles regarding the freedom of speech.  First, the Supreme Court has recognized that the First Amendment reflects a "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Boos*, 485 U.S. at 319 (quotations and citation omitted). Thus, courts must "scrutinize carefully" any restrictions on "public issue picketing." *Id*. at 318.

Second, the restrictions would extend to public streets and sidewalks that are within 300 feet of a funeral or that are visible from or within earshot of a funeral.  Public streets and sidewalks are "traditional public fora" that "time out of mind, have been used for  purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Id*. (quotations and citation omitted).  In such places, which occupy a "special position in terms of First Amendment protection, the government's ability to restrict expressive activity is very limited." *Id*. (quotations and citations omitted).  Further, the restrictions would also regulate speech that private property owners may engage in or authorize on their own property lying within the restricted area.  Such restrictions are analyzed under the same standard as restrictions on speech in a public forum. *See Turner Broadcasting System, Inc. v. F.C.C.*, 512 U.S. 622, 676 (1994)(O'Connor, J.,concurring in

17

part and dissenting in part)("Under the First Amendment, it is normally not with the government's power to decide who may speak and who may not, at least on private property or in a traditional public fora."). *See also Madsen*, 512 U.S. at 770 (analyzing provisions of injunction restricting speech on private property under same standard as provisions restricting speech on public property); *Cleveland Area Board of Realtors v. City of Euclid*, 88 F.3d 382 (6th Cir. 1996) (applying intermediate scrutiny to content-neutral restrictions on residential lawn signs); *Wheeler v. Commissioner of Highways*, 822 F.2d 586 (6th Cir. 1987)(applying intermediate scrutiny to content-neutral restrictions on advertising devices on private property).

Third, "[t]he protection given speech and press was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *Roth v. United States*, 354 U.S. 476, 484 (1957). "All ideas having even the slightest redeeming social importance – unorthodox ideas, controversial ideas, even ideas hateful to the prevailing climate of opinion– have the full protection of the guaranties, unless excludable because they encroach upon the limited area of more important interests." *Id*.

"The hallmark of the protection of free speech is to allow 'free trade in ideas' – even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v. Black*, 538 U.S. 343, 358 (2003)(quotations and citation omitted). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Free speech "may indeed serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger." *Id.* at 408-09.

Thus, individuals have a First Amendment right to speak on a public street and on their own

property about a public issue – even where the speech is distasteful, discomforting, odious or ignorant. Nevertheless, the state also has a significant interest in prohibiting interference with funerals. This is because the state has an interest "in guaranteeing citizens the right to participate in events or demonstrations of their own choosing without being subjected to interference by other citizens." *Sanders v. United States*, 518 F.Supp. 728, 730 (D.D.C. 1981), *aff'd without op.*, 679 F.2d 262 (D.C. Cir. 1982). An intrusion into another event "is an interference with the rights of other citizens to enjoy the event or demonstration in which they have chosen to participate, in an area reserved for them." *Id.*

As to the state's interest in protecting citizens from "unwanted communications," however, it is less clear whether or to what extent that interest is a legitimate justification for restricting speech. It must first be understood that the state has no legitimate interest in restricting communications simply because the recipients may find the communications offensive. Speech cannot be prohibited merely because of a "desire to avoid the discomfort and unpleasantness that always accompanies an unpopular view point." *Grayned v. City of Rockford*, 408 U.S. 104, 117 (1972)(citation and quotations omitted). "It is firmly settled that under our Constitution the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers." *Street v. New York*, 394 U.S. 576, 592 (1969). "The First Amendment does not guarantee that. . . concepts virtually sacred to our Nation as a whole – such as the principle that discrimination on the basis of race is odious and destructive – will go unquestioned in the marketplace of ideas." *Johnson*, 491 U.S. at 418.

"As a general matter, we have indicated that in public debate our own citizens must tolerate insulting, and even outrageous speech in order to provide adequate breathing space to the freedoms

19

protected by the First Amendment." *Boos*, 485 U.S. at 322 (quotations and citation omitted). *See also Texas v. Johnson*, 491 U.S. 397 (1989)(First Amendment protects right of person to burn U.S. flag during protest rally); *Brandenburg v. Ohio*, 395 U.S. 444 (1969)(First Amendment protects right of Ku Klux Klan leader to make derogatory remarks against Jews and blacks).

The Supreme Court has, however, recognized a state's interest in protecting citizens from "unwanted communications." In *Frisby v. Schultz*, 487 U.S. 474 (1988), the plaintiffs presented a facial challenge to an ordinance that the Court interpreted as prohibiting picketing in front of a residence. *Id*. at 482. The Court determined that the government had a significant interest in protecting residential privacy. *Id*. at 484. In so doing, the Court noted its prior decisions recognizing "the unique nature of the home" and recognizing that "[p]reserving the sanctity of the home, the one retreat to which men and women can repair to escape from the tribulations of their daily pursuits, is surely an important value." *Id*. (quoting *Carey v. Brown*, 447 U.S. 455, 471 (1980)).

The Court further explained that "[o]ne important aspect of residential privacy is protection of the unwilling listener. Although in many locations, we expect individuals simply to avoid speech they do not want to hear, the home is different." *Id*. (citations omitted). "Thus, we have repeatedly held that individuals are not required to welcome unwanted speech into their own homes and that the government may protect this freedom. *Id*. at 485. The Court further declared that the "First Amendment permits the government to prohibit offensive speech as intrusive when 'the captive' audience cannot avoid the objectionable speech." *Id*. at 487.

In contrast, in *Cohen v. California*, 403 U.S. 15 (1971), the Supreme Court stated:

While this Court has recognized that government may properly act in many situations

20

> to prohibit intrusion into the privacy of the home of unwelcome views and ideas...
> we have at the same time consistently stressed that we are often captives outside the
> sanctuary of the home and subject to objectionable speech. The ability of
> government, consonant with the Constitution, to shut off discourse solely to protect
> others from hearing it is, in other words, dependent upon a showing that substantial
> privacy interests are being invaded in an essentially intolerable manner.

*Id*. at 21 (quotations and citation omitted).

In *Cohen*, the defendant was convicted under a local ordinance for disturbing the peace when

he wore a jacket bearing the words "Fuck the Draft" into a courthouse. *Id*. at 16. The Court

overturned the conviction, stating that the people in the courthouse:

> could effectively avoid further bombardment of their sensibilities simply by averting
> their eyes. And while it may be that one has a more substantial claim to a
> recognizable privacy interest when walking through a courthouse corridor than, for
> example, strolling through Central Park, surely it is nothing like the interest in being
> free from unwanted expression in the confines of one's home.

*Id*. at 21-22.

In *Ward*, the Supreme Court reviewed a city noise control measure which sought to regulate

the volume of amplified music at an amphitheater in Central Park. 491 U.S. at 784. The

government's principal justification for the regulation was to prevent the noise from intruding upon

those using a designated quiet area of the park called the "Sheep Meadow" or upon those who lived

within the sound range of the stage. *Id*. at 784, 792. The Court stated that, "it can no longer be

doubted that government has a substantial interest in protecting its citizens from unwelcome noise."

*Id*. at 796 (quotations and citation omitted). Further, this interest " is by no means limited to [the

home], for the government may act to protect even such traditional public forums as city streets and

parks from excessive noise." *Id*. at 796 (quotations and citation omitted).

In *Erznoznik v. Jacksonville*, 422 U.S. 205 (1988), the Court was presented with a facial

21

challenge to a city ordinance that prohibited drive-in move theaters from showing films containing nudity if the theater's screen was visible from a public place or street. *Id.* at 206. The city's primary argument was that it had an interest in protecting its citizens against unwilling exposure to materials that may be offensive. *Id.* at 208. The Court stated that, when the government undertakes to shield the public from certain kinds of speech because they are offensive, the First Amendment strictly limits its power. *Id.* at 209.

"Such selective restrictions have been upheld only when the speaker intrudes on the privacy of the home, or the degree of captivity makes it impractical for the unwilling viewer or auditor to avoid exposure. *Id.* (citations omitted). Absent these "narrow circumstances," however, "the burden normally falls upon the viewer to avoid further bombardment of his sensibilities simply by averting his eyes." *Id.* at 210-11 (quotations and citations omitted).

The Court determined that the ordinance sought only to keep films from being seen from public streets and places where the offended viewer can readily avert his eyes. *Id.* at 212. "In short, the screen of a drive-in theater is not so obtrusive as to make it impossible for an unwilling individual to avoid exposure to it." *Id.* (quotations and citations omitted). The Court concluded that "the limited privacy interest of persons on the public streets cannot justify this censorship of otherwise protected speech on the basis of its content." *Id.*

Thus, while a state cannot protect citizens from communications solely because the citizens may find the communications offensive, a state may protect citizens from unwelcome communications – including offensive communications – where the communications invade substantial privacy interests in an essentially intolerable manner, as where the communications are directed at citizens in their homes or where the communications are directed at a "captive" audience

22

and are so obtrusive that individuals cannot avoid exposure to them.  Pursuant to *Ward*, the state may protect citizens from unwanted communications – at least those that take the form of excessive noise – even beyond the home, as for example in a designated "quiet area" of a park.

In *Madsen*, the Court reviewed a state court injunction which prohibited anti-abortion protesters from demonstrating in certain places and ways outside of a health clinic that performed abortions. 512 U.S. at 757. A clinic doctor testified before the state court that, as a result of the protesters' activities, patients manifested higher anxiety and hypertension and, thus, required higher levels of sedation for surgery. *Id*. at 758.  The Supreme Court also noted that the protesters' noise could be heard in the clinic, causing patients stress during surgery and while recuperating. *Id*. at 758. The state court entered an injunction which prohibited the protesters from engaging in various activities, some of the provisions of which were similar to the provisions at issue in this case and will be discussed further below.

 In determining whether the injunction was justified by a "significant government interest," the Court noted that a state "has a strong interest in protecting a woman's freedom to seek lawful medical or counseling services in connection with her pregnancy." *Id*. at 767.  "The State also has a strong interest in ensuring the public safety and order, in promoting the free flow of traffic on public streets and sidewalks, and in protecting the property rights of all its citizens." *Id*. at 768.

The Court also agreed with the state court that the state has a strong interest in residential privacy, which the Court  "applied by analogy to medical privacy." *Id*.  As to this, the Court further agreed with the state court's observation that "while targeted picketing of the home threatens the psychological well-being of the 'captive' resident, targeting picketing of a hospital or clinic threatens not only the psychological, but also the physical well-being of the patient held 'captive' by medical

circumstance." *Id*.  The Court determined that a combination of these "governmental interests is quite sufficient to justify an appropriately tailored injunction to protect them." *Id*. at 768.

Thus, the *Madsen* Court did not explicitly justify the injunction at issue in terms of the state's interest in protecting citizens from unwanted communications.  Nevertheless, it recognized that citizens may be held "captive" to unwanted communications even outside the home.  In *Schenck v. Pro-Choice Network of Western New York*, 519 U.S. 357 (1997), the Supreme Court further explained *Madsen*, stating that the governmental interest in protecting the medical privacy and well-being of patients "held 'captive' by medical circumstances" was relevant in *Madsen* because the patients, "*while inside the clinic* heard the chanting and shouting of the protesters and suffered increased health risks as a result." *Id*. at 376 n.8.  In *Schenck*, the Court further explained that, in *Madsen*, the Court did not sustain the injunction "on the basis of any generalized right 'to be left alone' on a public street or sidewalk." *Id.* at 383.  Thus, it appears that *Madsen* may only recognize a state's interest in protecting individuals held captive by medical circumstances from unwanted communications that negatively affect their physical well-being.

In *Hill*, another case involving anti-abortion protests outside of a medical facility, the Supreme Court discussed at length the "'unwilling listeners' interest in avoiding unwanted communication":

> The right to free speech, of course, includes the right to attempt to persuade others to change their views, and may not be curtailed simply because the speakers's message may be offensive to his audience.  But the protection afforded to offensive messages does not always embrace offensive speech that is so intrusive that the unwilling audience cannot avoid it.  *Frisby v. Schultz*, 487 U.S. 474, 487 (1988).  Indeed, "[i]t may not be the content of the speech, as much as the deliberate 'verbal or visual assault,' that justifies proscription." *Erznoznik v. Jacksonville*, 422 U.S. 205, 210-11 (1975)(citation and brackets omitted).  Even in a public forum, one of the reasons that we tolerate a protester's right to wear a jacket expressing his

opposition to government policy in vulgar language is because offended viewers can "effectively avoid further bombardment of their sensibilities simply by averting their eyes." *Cohen v. California*, 403 U.S. 15, 21 (1971).

The recognizable privacy interest in avoiding unwanted communication varies widely in different settings. It is far less important when "strolling through Central Park" than when "in the confines of one's own home," or when persons are "powerless to avoid" it. *Id.* at 21-22. But even the interest in preserving the tranquility in "the Sheep Meadow" portion of Central Park may at times justify official restraints on offensive musical expression. *Ward*, 491 U.S. at 784. . . .

The unwilling listener's interest in avoiding unwanted communication has been repeatedly identified in our cases. It is an aspect of the broader "right to be let alone" that one of our wisest Justices characterized as "the most comprehensive of rights and the right most valued by civilized men." *Olmstead v. United States*, 277 U.S. 438, 478 (1928)(Brandeis, J., dissenting). The right to avoid unwelcome speech has special force in the privacy of the home, *Rowan v. United States Post Office Dept.*, 397 U.S. 728, 738 (1970). . . but can also be protected in confrontational settings. . . .

*Hill*, 530 U.S. at 716-717.

Again, in *Hill*, the Supreme Court reviewed a Colorado statute that prohibited any person within 100 feet of a health care facility's entrance from "knowingly approach[ing] within eight feet of another person, without the person's consent, for the purpose of passing a leaflet or handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person. . . ." 530 U.S. at 707 (quotations omitted). Though the case discusses an "unwilling listener's interest in avoiding unwanted communications," it is not clear that, in the end, the Court found the statute was justified by the state's interest in protecting citizens from unwanted communications.

Regarding the legitimacy of the state's interests, the Court discussed the state's traditional "police powers to protect the health and safety of their citizens," which may justify "a special focus on unimpeded access to health care facilities and the avoidance of potential trauma to patients. . . ." *Id.*. at 715. In a footnote, the Court stated that the purpose of the Colorado statute is not to protect a potential listener from hearing a particular message. *Id.* at 718 n.25. Instead, the purpose "is to

25

protect those who seek medical treatment from the potential physical and emotional harm suffered when an unwelcome individual delivers a message (whatever its content) by physically approaching an individual at close range." *Id*. The Court further stated that, "[i]n offering protection from that harm. . . the State pursues interests constitutionally distinct from the freedom from unpopular speech. . . ." *Id*. at 718 n.25. The Court also discussed the recognized state interest in "controlling the activity" around certain public and private places including health care facilities. *Id* at 728.

The Court explicitly stated that it was not recognizing a "right to avoid unpopular speech in a public forum" and stated that it was instead merely noting that it has "repeatedly recognized the interests of unwilling listeners in situations where 'the degree of captivity makes it impractical for the unwilling listener or auditor to avoid exposure.'" *Id*. at 718. In a footnote, the Court stated that the issue of whether there is a "right" to avoid unwelcome expression was not before it. *Id*. at 718 n. 25.

Thus, it is not clear whether the *Hill* Court justified the ordinance at issue by the state's interest in protecting citizens from unwanted communications or, as in *Madsen*, by the state's interest in protecting the psychological and physical well-being of patients seeking lawful medical services. In another case in which the Kentucky Attorney General relied on *Hill* in arguing that the right to be left alone extends beyond the home, the Sixth Circuit found the argument "dubious at best." *Anderson v. Spear*, 356 F.3d 651, 661 (6th Cir.), *cert. denied* (2004). In *Anderson*, the Sixth Circuit invalidated as overbroad a Kentucky statute which prohibited "electioneering" within 500 feet of polling places. Kentucky argued that one of the state interests justifying the statute was the right to be left alone. The state explained that many voters simply did not want to be approached on their way to the voting booth. *Id*. at 660. As to the "so-called right to be left alone," the Sixth

26

Circuit stated:

> The Supreme Court generally has resisted the invitation to expand to public spaces the limited right of individuals to be left alone *inside* their homes, even when the messages may prove to be offensive to the listener. *See generally National Socialist Party of Am. v. Skokie*, 432 U.S. 43 (1997)(granting a stay to an injunction of a Nazi march scheduled to be conducted in a neighborhood that included numerous holocaust survivors, who respectively had voiced their desire to be left alone); *see* also *Cohen v. California*, 403 U.S. 15 (1971)(noting that the risk of offense was not a basis for restricting the ability of a speaker to wear a jacket adorned with a vulgar message in a courthouse, but rather that those offended may avert their eyes).

*Id*.

The Sixth Circuit concluded that "the State's interest in assuring that voters are not subjected to any unwanted campaign speech alone cannot be a sufficient basis to regulate that clearly protected speech." *Id*. at 661.

Assuming that the Court found the statute at issue in *Hill* was justified by the state's interest in protecting citizens from unwanted communications even when the citizens are outside the home, the case may simply hold that the state has an interest in protecting citizens from unwanted communications when the communicator approaches within eight feet of the recipient because such communications are so obtrusive that they are impractical or impossible to avoid. Thus, such communications may be constitutionally restricted  in line with the Supreme Court's holdings that the state may protect citizens from unwanted communications where the communications are directed at citizens either in their homes or where citizens are captive and the communications are so obtrusive that individuals cannot avoid exposure to them.

A funeral is a deeply personal, emotional and solemn occasion. Its attendees have an interest in avoiding unwanted, obtrusive communications which is at least similar to a person's interest in avoiding such communications inside his home. Further, like medical patients entering a medical

facility, funeral attendees are captive. If they want to take part in an event memorializing the deceased, they must go to the place designated for the memorial event. Whatever the meaning of *Hill*, for purposes of this Opinion, the Court will assume that the state has an interest in protecting funeral attendees from unwanted communications that are so obtrusive that they are impractical to avoid.

### 4)      Whether Sections 5(1)(b) and (c) are Narrowly Tailored.

The next issue is whether Sections 5(1)(b) and (c) are narrowly tailored to further the government's interest in preventing interferences with funerals or in protecting citizens from unwanted communications that are so obtrusive that they are impractical to avoid.

In order for a statute to be "narrowly tailored," the law must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Cleveland Area Board of Realtors*, 88 F.3d at 388 (quoting *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 478 (1989)). "A statute is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy." *Frisby*, 487 U.S. at 485. The requirement of narrow tailoring is satisfied so long as the "regulation promotes a substantial government interests that would be achieved less effectively absent the regulation." *Ward*, 491 U.S. at 799 (citation omitted). "Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id*. at 799-800.

In *Frisby,* the Court determined the constitutionality of a content-neutral ordinance that the Court interpreted as prohibiting picketing in front of a  particular residence. 487 U.S. at 483.  In determining whether the ordinance was narrowly tailored to protect only unwilling recipients of the communications, the Court noted that the type of focused picketing prohibited by the statute was

28

different than those more "generally directed means of communications" such as handbilling, soliciting, and marching that could not be completely banned in residential areas. *Id*. at 486. The residential picketing was "narrowly directed at the household, not the public. The type of picketers banned by the [city] ordinance generally do not seek to disseminate a message to the general public but to intrude upon the targeted resident, and to do so in an especially offensive way." *Id*. The Court determined that the target of the focused picketing was "captive" and was "left with no ready means of avoiding the unwanted speech." *Id*. at 487. Accordingly, the Court determined that the ordinance banning all targeted residential picketing was narrowly tailored. *Id.*

In *Madsen*, the Court reviewed a state court injunction which prohibited anti-abortion protesters from engaging in the following activities:

1) At all times on all days, from congregating, picketing, patrolling, demonstrating or entering that portion of public right-of-way or private property within [36] feet of the property line of the [medical] Clinic. . . An exception to the 36 foot buffer zone is the area immediately adjacent to the Clinic on the east. . . The [petitioners]. . . must remain at least [5] feet from the Clinic's east line.  Another exception to the 36 foot buffer zone relates to the record title owners of the property to the north and west of the Clinic. The prohibition against entry into the 36 foot buffer zones does not apply to such persons and their invitees.  The other prohibitions contained herein do apply if such owners and their invitees are acting in concert with the [petitioners]....

2) During the hours of 7:30 a.m. through noon, on Mondays through Saturdays, during surgical procedures and recovery periods, from singing, chanting, whistling, shouting, yelling, use of bullhorns, auto horns, sound amplification equipment or other sounds or images observable to or within earshot of the patients inside the Clinic.

3) At all times on all days, in an area within [300] feet of the Clinic, from physically approaching any person seeking the services of the Clinic unless such person indicates a desire to communicate by approaching or by inquiring of the [petitioners]. . . .

4)      At all times on all days, from approaching, congregating, picketing, patrolling, demonstrating or using bullhorns or other sound amplification equipment within [300] feet of the residence of any of the [respondent's] employees, staff, owners or agents. . .

*Id* at 759-60.

The Court determined that a content-neutral injunction imposed by a court should be subjected to a higher degree of constitutional scrutiny than statutory provisions passed by a legislature such as those at issue in this case. *Id*. at 765. Nevertheless, the Court's analysis in *Madsen* regarding whether the challenged provisions burdened "no more speech than necessary to serve a significant government interest" is instructive in this case, given the similarities of the relevant provisions of the injunction in *Madsen* and Sections 5(1)(b) and (c) of the Kentucky Act.

As to the 36-foot buffer zone, the Court determined it was a "means of protecting unfettered ingress to and egress from the clinic and ensuring that petitioners do not block traffic." 512 U.S. at 769. The Court noted that the buffer zone was narrow enough that the protesters would still be located at most 10 to 12 feet from cars approaching and leaving the clinic. *Id*. at 770. Further, protesters standing across from the clinic could still be seen and heard from the clinic parking lots. *Id*. Thus, the Court determined that the 36-foot buffer zone around the clinic entrances and driveway burdened no more speech than necessary to accomplish the governmental interest of protecting access to the clinic and the orderly flow of traffic. *Id*. at 770-71.

As to private property included in the 36-foot buffer zone, however, the Court found that nothing in record indicated that the petitioners' activities on the private property had obstructed access to the clinic. Absent such evidence, the Court determined, this portion of the buffer zone failed to serve the stated significant government interests. *Id*. at 771. Thus, the 36-foot buffer zone

30

as applied to the private property to the north and west of the clinic burdened more speech than necessary to protect access to the clinic. *Id*.

As to the noise ordinance in the injunction prohibiting sounds or images observable to or within earshot of the patients inside the clinic, the Court noted that "[w]e must, of course, take account of the place to which the regulations apply in determining whether these restrictions burden more speech than necessary." *Id*. at 772. "Noise control is particularly important around hospitals and medical facilities during surgery and recovery periods." *Id*. The Court determined that the "limited noise restrictions imposed by the state court order burdened no more speech than necessary to ensure the health and well-being of the patients in the clinic." *Id*. The Court stated that, "[i]f overamplified loudspeakers assault the citizenry, government may turn them down." *Id*. at 773 (quoting *Grayned*, 408 U.S. at 115).

The Court determined, however, that the same could not be said for the "images observable" provision of the state court injunction. *Id*. "Clearly, threats to patients or their families, however communicated, are proscribable under the First Amendment. But rather than prohibiting the display of signs that could be interpreted as threats. . . , the state court issued a blanket ban on all 'images observable.'" *Id*. at 773. The Court determined that this ban burdened more speech than necessary to achieve the purpose of limiting threats to clinic patients or their families. *Id*. at 773. Further, the Court determined that, to the extent that the "images observable" provision was intended to reduce the level of anxiety and hypertension suffered by patients, it would be much easier "for the clinic to pull its curtains than for a patient to stop up her ears, and no more is required to avoid seeing placards through the windows of the clinic." *Id*. at 773.

As to the provision prohibiting petitioners from approaching any person seeking the clinic's

services "unless such person indicates a desire to communicate" in an area within 300 feet of the clinic, the Court determined that, "[a]bsent evidence that the protesters' speech is independently proscribable (*i.e.,*, "fighting words" or threats), or is so infused with violence as to be indistinguishable from a threat of physical harm.. . .this provision cannot stand." *Id*. at 774.  The Court further determined that the "consent" requirement alone invalidated this provision, burdening more speech than necessary to prevent intimidation and ensure access to the clinic.  *Id*. at 774.

As to the provision prohibiting sound amplification equipment within 300 feet of a clinic employee's residence, the Court determined that the same analysis applies to it as to the injunction's noise ordinance protecting the clinic itself: "the government may simply demand that petitioners turn down the volume if the protests overwhelm the neighborhood."  *Id.*

As to the prohibition against picketing within 300 feet of an employee's residence, quoting *Frisby*, the Court stated that "[t]he State's interest in protecting the well-being, tranquility, and privacy of the home is certainly of the highest order in a free and civilized society." *Id*. at 775. Nevertheless, the Court noted that the 300-foot restricted zone was much larger than the restricted zone approved in *Frisby* which was limited to a particular residence.  *Id*. The Court determined that the 300-foot zone would ban "[g]eneral marching through residential neighborhoods, or even walking a route in front of an entire block of houses."  *Id*. at 775. Thus, the 300-foot ban on picketing in residential neighborhoods was unconstitutional.

In *Hill*, the Court determined that the content-neutral eight-foot floating buffer zone was narrowly tailored to serve a significant state interest. The floating buffer zone prohibited any person within 100 feet of the entrance of a health care facility from knowingly approaching within eight feet of another person, without that person's prior consent, "for the purpose of passing a leaflet or

handbill to, displaying a sign to, or engaging in oral protest, education, or counseling with such other person. . . ." *Id*. at 708.

With respect to the prohibition against displaying signs, the Court determined that the 8-foot zone should have no adverse impact on the readers' ability to read signs displayed by the demonstrators. *Id*. at 726. With respect to oral speech, the Court noted that the statute did not limit amplification equipment and that the 8-foot zone was "normal conversational distance." *Id.* at 726-27. The Court also noted that only attempts to address "unwilling listeners" would be affected by the statute. *Id*. at 727. Finally, as to leafleting, the Court determined that the statute did not prevent a person from "proffering their literature; they simply cannot approach within eight feet of an unwilling recipient." *Id*. at 728 n.33.

The provisions at issue in this case burden substantially more speech than is necessary to prevent interferences with a funeral or to protect funeral attendees from unwanted, obtrusive communications that are otherwise impractical to avoid. Section 5(1)(b) prohibits all congregating, picketing, patrolling, demonstrating or entering on property within 300 feet of a funeral whether such activities interfere with the funeral or not and whether such activities are authorized by funeral attendees or not. It prohibits such activity whether the persons involved in the activities are visible to funeral participants or not and whether they are making any sound that funeral participants can hear or not. Thus, in addition to prohibiting intrusive activities, Section 5(1)(b), prohibits activity that would not interfere with a funeral and prohibits communications that are neither necessarily unwanted nor so obtrusive that they cannot be avoided by the funeral attendees.

Further, the 300-foot buffer zone is substantially larger than the 36-foot buffer zone upheld in *Madsen*, the 8-foot floating buffer zone upheld in *Hill* and the single-resident zone upheld in

*Frisby*.  The 300-foot zone would encompass public sidewalks and streets and would restrict private property owners' speech on their own property. The zone is large enough that it would restrict communications intended for the general public on a matter completely unrelated to the funeral as well as messages targeted at funeral participants.

Likewise Section 5(1)(c)(1) prohibits all unauthorized sounds or images observable to or within earshot of funeral participants whether such sounds or images are capable of interfering with the funeral or not.  Instead of prohibiting "unreasonable" or "interfering" sounds or images, the provision contains a blanket prohibition against any person making any image or sound perceptible to funeral attendees. Such a prohibition is substantially broader than necessary to prohibit interference with a funeral.

In *Madsen*, the Supreme Court approved a similar noise ordinance.  However, there the state justified the ordinance as necessary to insure the health and well-being of patients in the clinic and presented medical evidence that patients who heard the protests at issue suffered physical consequences.  Here, the state has justified the provisions by the state's interest in prohibiting interference with a funeral and in protecting citizens from unwanted communications.  Sounds that are simply "within earshot" of funeral attendees will not necessarily interfere with a funeral.  Likewise, sounds that are simply "within earshot" of funeral attendees are not necessarily so obtrusive as to be impractical to avoid.

The "images observable" provision of Section 5(1)(c)(1) also burdens substantially more speech than necessary to prohibit interference with a funeral or to protect citizens from obtrusive, unavoidable images. Unlike sounds, images that are simply "observable" may be avoided by averting the eyes or, when the potential observers are indoors, by pulling the curtains.

34

Read literally, Section 5(1)(c)(2) prohibits all unauthorized distribution of literature occurring anywhere during any funeral.  With no geographic restriction, this provision clearly burdens more speech than necessary.  Further, even if the provision is read to prohibit only the distribution of literature where such distribution is observable to or within earshot of funeral participants, the provision burdens substantially more speech than necessary to prevent interference with the funeral or to protect citizens from unwanted, obtrusive communications.

Moreover, the Court cannot construe the provisions as prohibiting only sounds or images that are "unreasonable," "outrageous,"  "disruptive," or "threatening," or that "tend to obstruct or interfere with" a funeral. Such sounds and images are already prevented in other sections of the Act that are not challenged in this action.  Section One of the Act prohibits, within 300 feet of a funeral "fighting," "violent, tumultuous or threatening behavior," "unreasonable noise"  and  the creation of "a hazardous or physically offensive condition." Section Three of the Act prohibits any person from doing any act "tending to obstruct or interfere with" a funeral and prohibits any person from making "any utterance, gesture, or display designed to outrage the sensibilities of the group attending the occasion" when such acts are done with the intent to disrupt a funeral.  Section 5(1)(a) of the Act prohibits anyone from blocking, impeding, inhibiting or in any other manner obstructing or interfering with access into or from any building or parking lot of a building or cemetery where a funeral is being conducted.

It is not reasonable to construe Sections 5(1)(b) and (c) as prohibiting precisely the same kinds of activities that are already prohibited by other sections of the Act. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.' " *TRW Inc. v.*

35

*Andrews,* 534 U.S. 19, 31 (2001) (quoting *Duncan v. Walker,* 533 U.S. 167, 174 (2001)). Unless Section 5(1)(b) and (c) are superfluous, they must be intended to restrict sounds that are less obtrusive and disruptive than the "unreasonable noise" already prohibited in Section One. Likewise, Section 5(1)(b) and (c) must be intended to restrict sounds and images that are less obtrusive and disruptive than those "designed to outrage the sensibilities" of funeral participants already prohibited in Section Three. Likewise, Section 5(1)(b) and (c) must be aimed at communications that are less obtrusive and disruptive than the acts that tend to obstruct or interfere with a funeral that are already prohibited by Section Three of the Act and the acts that would obstruct or interfere with ingress to and egress from a funeral prohibited by Section 5(1)(a) of the Act.

Sections 5(1)(b) and (c) restrict substantially more speech than that which would interfere with a funeral or that which would be so obtrusive that funeral participants could not avoid it. Accordingly, the provisions are not narrowly tailored to serve a significant government interest but are instead unconstitutionally overbroad. In light of this determination, the Court declines to address McQueary's argument that the provisions constitute prior restraints on speech or that Section 5(1)(c) unconstitutionally conditions expression upon the approval of private individuals.

### B.   Other Factors on Motion for Preliminary Injunction.

It is "well-settled precedent" that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury" *See G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1078 (6th Cir. 1994). Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Id*. at 1079. Finally, "if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoyment." *Deja Vu of Nashville, Inc. v. Metropolitan*

*Gov't of Nashville and Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001).  Because McQueary has established a strong likelihood of success on the merits on his First Amendment challenge to Sections 5(1)(b) and (c) of the Act, the Court finds that he would suffer irreparable injury if the injunction requested in this case is not issued; the injunction would not cause substantial harm to others; and the public interest will be served by issuance of the injunction.

### IV.   CONCLUSION.

For all the above reasons, the Court hereby ORDERS as follows:

1)   The Motion for Preliminary Injunction (Rec. No. 2)  is GRANTED;

2)   The Motion for Judgment on the Pleadings (Rec. No. 8) is DENIED;

3)   The Motion to Consolidate the Preliminary Injunction Hearing with the Trial (Rec. No. 17) is DENIED as moot;  and

4)   The Attorney General, his agents and assigns are hereby ENJOINED from enforcing Sections 5(1)(b) and (c) of Kentucky House Bill No. 333 (2006 Kentucky Laws Ch. 51) and Kentucky Senate Bill No. 93 (2006 Kentucky Laws Ch. 50).

This 26th day of September, 2006.

**Signed By:**

*__Karen K. Caldwell__*

**United States District Judge**